Dockets.Justia.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

Carnegie Mellon University and the University of
Pittsburgh – Of the Commonwealth System of
Higher Education,

                              Plaintiffs,

- v -

Westridge Capital Management, Inc., WG Trading
Company Limited Partnership, Westridge Capital
Management Enhancement Funds, Inc., WG Trading
Investors, LP, Paul Greenwood, Stephen Walsh,
Jack Eldred Reynolds, James Carder and Deborah
Duffy,

                              Defendants.

**Civil Action No.**

## COMPLAINT

Plaintiffs, by their attorneys, Reed Smith LLP, as and for their Complaint against the Defendants, allege as follows:

## PARTIES

1.      Plaintiff Carnegie Mellon University ("Carnegie Mellon") is a private university with a corporate address of 5000 Forbes Avenue, Pittsburgh, Pennsylvania.

2.      Plaintiff the University of Pittsburgh – Of the Commonwealth System of Higher Education ("University of Pittsburgh") is a non-sectarian, coeducational, state-related, research university with a corporate address of 4200 Fifth Avenue, Pittsburgh, Pennsylvania  15260.  The University of Pittsburgh derives its corporate existence under the laws of the Commonwealth of Pennsylvania (the

"Commonwealth") by reason of an act of the State Legislature of the Commonwealth establishing an "Academy or Public School in the town of Pittsburgh" on February 28, 1787 and from the act of February 18, 1819 incorporating the "Western University of Pennsylvania." On July 11, 1908, the name was changed to "University of Pittsburgh" by order of the Court of Common Pleas of Allegheny County. On July 28, 1966, the Pennsylvania State Legislature enacted the "University of Pittsburgh – Commonwealth Act" which changed the name of the University to "University of Pittsburgh – Of the Commonwealth System of Higher Education" and established the University as an instrumentality of the Commonwealth to serve as a state-related institution of the Commonwealth System of Higher Education.

3.    Carnegie Mellon and the University of Pittsburgh are sometimes collectively referred to herein as "Plaintiffs."

4.    Upon information and belief, the Defendant Westridge Capital Management, Inc. ("WCM") is a Delaware corporation with a principal place of business at 222 East Carrillo Street, Suite 300, Santa Barbara, CA 93101. WCM is registered with the Securities and Exchange Commission as a registered investment adviser and is the investment adviser for the WCM Fund (defined below) and is an investment adviser to the University of Pittsburgh.

5.    Upon information and belief, WG Trading Investors, LP ("WGTI") is a Delaware limited partnership with a principal place of business at One Lafayette Place, 2nd Floor, Greenwich, CT 06830 and/or One East Putnam Avenue, Greenwich, CT 06830. The managing general partners of WGTI are Paul Greenwood and Stephen

Walsh. The limited partner of WGTI is Walsh Greenwood & Co., a New York Limited Partnership.

6.      Upon information and belief, the Defendant Westridge Capital Management Enhancement Funds, Inc. ("WCM Fund") is a listed commodity pool organized under the laws of the British Virgin Islands with a registered address at the Todman Building, Main Street, P.O. Box 3140, Road Town, Tortola, British Virgin Islands. Upon information and belief, the WCM Fund currently has 16 participants, including university foundations and retirement and pension plans.

7.      Upon information and belief, the Defendant WG Trading Company Limited Partnership ("WGTC") is a Delaware limited partnership operating as a commodity pool (the "WGTC Pool"), and is a registered broker-dealer under the Securities and Exchange Act of 1934, with a principal place of business at One Lafayette Place, 2nd Floor, Greenwich, CT 06830 and/or One East Putnam Avenue, Greenwich, CT 06830. The managing general partners of WGTC are Paul Greenwood and Stephen Walsh and WGTI is a limited partner.

8.      Upon information and belief, the Defendant Paul Greenwood, NFA ID Number 279710, is a principal and co-commodity pool operator of WGTC and a control person and shareholder of WCM and maintains a business address at One Lafayette Place, 2nd Floor, Greenwich, CT 06830. Upon information and belief, Mr. Greenwood resides at 16 Wheeler Road, North Salem, New York.

9.      Upon information and belief, the Defendant Stephen Walsh, NFA ID Number 279714, is a principal and co-commodity pool operator of WGTC and a control person and shareholder of WCM and maintains a business address at One East

Putnam Avenue, Greenwich, CT 06830.  Upon information and belief, Mr. Walsh resides

at Half Moon Lane, Sands Point, New York.

10.    Upon information and belief, the Defendant Jack Eldred Reynolds,

NFA ID Number 311868, is a manager of the WCM Fund and maintains a business

address at 111 Town Square Place, Suite 1405, Jersey City, NJ 07310.

11.    Upon information and belief, the Defendant James Lewis Carder is

the president, shareholder, director, chief compliance officer and control person of WCM

and maintains a business address at 223 East Cardillo Street, Suite 300, Santa Barbara,

CA 93101.

12.    Upon information and belief, the Defendant Deborah Duffy, NFA

ID Number 280523, is an officer and principal of WGTC and maintains a business

address at One East Putnam Avenue, Greenwich, CT 06830.

13.    WCM, WGTI, WGTC, the WCM Fund, Mr. Greenwood and Mr.

Walsh have, from time to time, collectively referred to themselves as the "Westridge

Group," and will sometimes be so collectively referred to herein.

## JURISDICTION & VENUE

14.    This Court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 because this action involves substantial

questions arising under federal laws, including the Commodity Exchange Act, as

amended, the Securities Exchange Act of 1934, as amended, and the Investment Advisers

Act of 1940.

15.    This Court also has subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1332.  Diversity of citizenship exists in that Plaintiffs are each

citizens of Pennsylvania and none of the Defendants named herein are citizens of Pennsylvania and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over each of the Defendants named herein in that they have transacted their affairs from time to time within this judicial district and their activities giving rise to this action took place in this judicial district.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this district.

## FACTS RELEVANT TO ALL CLAIMS

Industry and Regulatory Background

17.     The Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and Commission Regulations thereunder, 17 C.F.R. §§ 1 *et seq.*, govern commodity futures trading in the United States.

18.     A "pool" is defined in Commission Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1), as any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests.

19.     Section 1a(5) of the Commodity Exchange Act, 7 U.S.C. § 1a(5) (2002), defines a "commodity pool operator" ("CPO") as any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

20.     Section 1a(6) of the Commodity Exchange Act, 7 U.S.C. § 1a(6) (2002), defines a "commodity trading advisor" ("CTA") as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in (I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility; (II) any commodity option authorized under section 4c; or (III) any leverage transaction authorized under section 19; or for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to above.

21.     A "participant" is defined in Commission Regulation 4.10(c), 17 C.F.R. § 4.10(c), as any person who has any direct financial interest in a pool (e.g., a limited partner).

The Westridge Group and Plaintiffs' Investments

22.     The Westridge Group operates at least two commodity pools, the WCM Fund and the WGTC Pool.  In addition, the Westridge Group offers investors two ways to invest in its enhanced index strategy:  (a) through the commingled WCM Fund, or (b) through a separate account managed by WCM pursuant to an investment management agreement between WCM and the investor (each such account, an "SMA").

23.     Carnegie Mellon has invested funds in the WCM Fund since April 2008.  Upon information and belief, as of January 31, 2009, Carnegie Mellon's investment account balance in the WCM Fund was in excess of $49 million.

24.     Pursuant to an Investment Management Agreement ("IMA") dated as of November 1, 2002 with WCM, the University of Pittsburgh has invested funds in an SMA with the Westridge Group since 2002.  Some of the funds invested by the University of Pittsburgh have in turn been invested in the WGTC Pool.  The University of Pittsburgh's current investment with the Westridge Group is in excess of $65 million.

The NFA Audit

25.     The National Futures Association ("NFA") is a not-for-profit membership corporation and is a self-regulatory organization that is registered with the U.S. Commodities Futures Trading Commission (the "Commission") as a futures association under Section 17 of the Act.  The NFA conducts audits and investigations of NFA member firms, including registered CTAs and CPOs, to monitor for compliance with NFA rules, some of which incorporate Commission Regulations by reference.

26.     On or about February 5, 2009, NFA auditors commenced an audit of the WCM Fund (the "Audit").

27.     On February 12, 2009, the NFA issued a Notice of Member Responsibility Action Under NFA Compliance Rule 3-15 (the "NFA Suspension Notice"), which suspended the Defendants Paul Greenwood and Stephen Walsh from NFA membership until further notice.  A copy of the NFA Suspension Notice is attached hereto as Exhibit A.

28.     The NFA Suspension Notice was based on, among other things, an accompanying Affidavit of a Director in NFA's Compliance Department, Jennifer Sunu.

A copy of the affidavit is attached hereto as Exhibit B.  Ms. Sunu's Affidavit sets forth

the following facts concerning the Defendants and her attempt to audit certain of the

Defendants:

        a.       Walsh is a sole proprietor commodity pool operator
("CPO") Member of NFA located in Greenwich, Connecticut.  He has been registered as
a CPO since July 3, 1997 and has been an NFA Member since January 21, 1998.  Walsh
is listed as a co-CPO with Greenwood for a listed commodity pool named WG Trading
Company, LP ("WGTC").

        b.       Greenwood is a sole proprietor CPO Member of NFA
located in Greenwich, Connecticut.  He has been registered as a CPO since June 19, 1997
and has been an NFA Member since December 10, 1997.  Greenwood is listed as a co-
CPO with Walsh for WGTC.

        c.       Reynolds is a sole proprietor CPO Member of NFA located
in Jersey City, New Jersey.  During or around April 2002, Reynolds became the pool
operator for a listed commodity pool named Westridge Capital Management
Enhancement Funds, Inc. ("WCM Fund").

        d.       The WCM Fund is currently active and its term sheet
indicates that Westridge Capital Management, Inc. ("WCM") is the investment adviser
for the WCM Fund.  WCM is a former NFA Member commodity trading advisor that
withdrew from membership in November 1992.  Reynolds has represented to NFA that
WCM makes all investment decisions for the WCM Fund.  Additionally, WCM filed a
Form ADV dated January 29, 2009 with the Securities and Exchange Commission,
which, in part, identifies Walsh and Greenwood as control persons and shareholders.

        e.       NFA Compliance Rule 2-13(a) adopts by reference
Commodity Futures Trading Commission ("CFTC") Regulation 4.23(b)(3) and, in effect,
requires NFA CPO Members such as Walsh, Greenwood and Reynolds to maintain and
produce the books and records of all other transactions in all other activities in which the
pool operator engages.  Those books and records must include cancelled checks, bank
statements, journals, ledgers, invoices, computer generated records and all other records,
data and memoranda which have been prepared in the course of engaging in those
activities.

        f.       NFA commenced an audit of Reynolds on February 5,
2009.  During that audit, NFA obtained financial information for the WCM Fund, which
indicated that the pool has 16 participants, including university foundations and
retirement and pension plans.  As of December 31, 2008, the WCM Fund's total assets
were reported as approximately $400 million and there were virtually no liabilities listed.
Of the $400 million, approximately $76 million was reported to be invested in futures
positions, cash and T-bills at NFA Member futures commission merchants Morgan

Stanley and Co., Inc. and Merrill Lynch Professional Clearing Corp., which NFA was able to verify through statements issued by those firms. The remaining $324 million is reflected as a note receivable from WG Trading Investors, LP ("WGTI").

        g.     During its exam, NFA reviewed several promissory notes issued to the WCM Fund from WGTI that were purportedly signed by Reynolds as a director of WGTI. These notes, including the most recent dated December 31, 2008 in the amount of approximately $325 million, appeared to be issued at the end of each calendar year and provided that interest on the note is to be paid in an amount that mirrors the rate of return (gross of fees) earned by a related entity - WGTC. Although these notes were purportedly signed by Reynolds as a director of WGTI, Reynolds denied executing the notes in a conversation with NFA staff on February 11, 2009.

        h.     As previously stated, NFA records reflect that WGTC is a commodity pool listed with NFA and co-operated by Walsh and Greenwood. Walsh and Greenwood share an office in Greenwich, Connecticut.

        i.     On February 5, 2009, NFA commenced audits of Walsh and Greenwood at their Greenwich location. Among other matters, NFA conducted the audits to clarify issues relating to the WCM Fund's loan to WGTI and the relationship between WGTI and WGTC. Although Greenwood was present when NFA arrived at the office, he left shortly thereafter after telling NFA to refer its questions to Deborah Duffy ("Duffy"), who Greenwood identified as the compliance officer.

        j.     Duffy provided NFA with a financial record for WGTI which reflected that, as of December 31, 2008, WGTI had approximately $812 million in assets. The financial records also indicated that WGTI was a pool participant and had approximately $93.8 million invested in WGTC. This amount represents approximately 29% of the WCM Fund's total loan to WGTI. WGTI's financial records also reflected that it had an unidentified accounts payable of approximately $194.5 million.

        k.     NFA also reviewed the financial records for WGTC and noted that this listed pool had approximately $1.3 billion in assets. The pool's records reflect, however, that of this $1.3 billion amount approximately $531.5 million is in accounts receivable. Although WGTC's financial records list WGTI's pool interest as approximately $93.8 million, the records also reflect that WGTC's largest account receivable is from WGTI in the amount of $194.5 million. This amount corresponds with the unidentified accounts payable entry on WGTI's financial records.

        l.     NFA subsequently made further inquiry of Duffy and Greenwood as to the disposition and location of WGTI's other assets in order to determine the location of the remainder (approximately $230 million) of the $324 million that the WCM Fund loaned to WGTI. Those assets included a $292.8 million "note receivable" from Greenwood and a $260.7 million "note receivable" from Walsh. Duffy represented that another $147 million of the assets are investments in two entities owned by Walsh and Greenwood. Further, the financial record indicates $8.2 million of the

assets as "employee advances". Therefore, the vast majority of WGTI's assets appear to be receivables from Greenwood and/or Walsh, investments in entities purported to be owned by Greenwood and/or Walsh and employee advances.

        m.     NFA subsequently learned that the "note receivable" is actually comprised of several individual notes, executed by Greenwood and Walsh over the years, each totaling millions of dollars. These notes are almost identical in their terms and indicate that the respective "sum is representative of the general partner's share of losses, withdrawals and payments". Additionally, the notes state that "The outstanding balance of this note is due and payable under 90 days written notice from WGTI".

        n.     The fact that more than $794 million of WGTI's assets were receivables from Walsh and Greenwood or entities that they purportedly owned was a matter of concern to NFA. Therefore, NFA determined to meet with Walsh and Greenwood to make inquiry and request documents regarding their financial wherewithal and ability to repay WGTI which in turn would enable WGTI to pay its note holders, including the WCM Fund. Additionally, NFA had questions for Walsh and Greenwood regarding their CPO activities, WCM's activities, WGTI's activities, and WGTC's activities.

        o.     Walsh has not been present in his Greenwich office at any time during NFA staff's visits on February 5th, 6th, 9th, 10th, 11th and 12th. The only two instances in which he has made himself available to staff were a twenty minute telephone conversation covering preliminary matters on February 5th, the day that NFA arrived at his office, and a brief telephone conversation on February 10th. During the conversation on February 5th, Walsh represented to NFA that he and Greenwood were the only general partners of WGTI.

        p.     NFA made a number of additional attempts to contact Walsh as matters of concern arose during the audit. For example, on February 9th, NFA attempted to contact him at a North Hills, New York office used by Walsh. Although a secretary told NFA that she would give Walsh the message that NFA had called, Walsh did not respond. Further, NFA left a voicemail for Walsh that evening stating that it was urgent that he contact NFA immediately in regard to the audit. Walsh's secretary called NFA the next morning and told NFA that Walsh would be in a meeting all day and that he would be unavailable to NFA. On February 10th, NFA auditors visited Walsh's North Hills office and found that he was not there. His secretary represented that Walsh was in meetings in New York City and that he would not be available at any time on that day. Walsh did have a two minute phone call with NFA later that day during which he acknowledged that he was aware that NFA was making inquiries directed to him, but represented that he would not be available to deal with the inquiries for at least several more days.

        q.     Greenwood has only been sporadically available to NFA, either in person or via teleconference, but has not made himself available to meet with NFA staff since February 6th and NFA has had no contact from him at all since February

9th. On that day, NFA staff engaged in a telephone conversation with Greenwood in which staff inquired as to the whereabouts of the funds from the WCM Fund that were loaned to WGTI but not invested in WGTC. Greenwood replied that he would have to get back to NFA about that subject and ended the conversation. He sent a subsequent e-mail to NFA in which he said that he would be at the Greenwich office on February 10th. NFA auditors visited the office on February 10th and were told by an administrative assistant that Greenwood would be in meetings in New York City all day and that he would not be available to meet with NFA. While at the office on February 10th, NFA staff observed that the administrative assistant repeatedly covered her mouth while conversing on the telephone and was moving documents from Duffy's office.

r. Additionally, on February 11th, NFA staff again visited Walsh and Greenwood's Greenwich office and were informed by a secretary that she would be the only individual in the office all day. She informed NFA that Duffy had a "personal emergency" and that Greenwood was travelling all day. She told NFA that she was trying to contact them to determine their schedules for the rem[a]inder of the week.

s. On February 10, 2009, NFA sent letters to Walsh and Greenwood by e-mail and fax in which they were reminded of their obligation to cooperate fully and promptly with NFA in any inquiry and requiring them to meet personally with NFA staff on that day. Further, the letters informed Walsh and Greenwood that a failure to cooperate could result in actions to suspend their NFA memberships. NFA was contacted later that day by attorneys representing Walsh and Greenwood. Those attorneys requested, additional time to determine if and when their clients would make themselves available to NFA. NFA agreed to give both men until 3:00 p.m. EST on February 11th to present themselves to answer questions and supply documents. Neither Walsh, Greenwood not their counsel contacted NFA to arrange a meeting by the appointed time and they have not done so since.

t. Instead, an attorney representing Walsh and Greenwood contacted NFA and indicated that by noon on Thursday, February 12, 2009, they would determine if Walsh and Greenwood would make themselves available to NFA on Friday, February 13, 2009. NFA responded to this attorney and indicated that Walsh and Greenwood had a deadline of 3:00 p.m. EST on February 11th to present themselves, that they failed to meet that deadline, and that an action suspending their NFA memberships may be forthcoming. In other words, NFA did not agree to extend the February 11th 3:00 p.m. EST deadline.

u. Both Greenwood and Walsh ultimately declined to make themselves available to cooperate fully and promptly in NFA's inquiry. NFA received an e-mail from Greenwood's attorney on the morning of February 12th in which the attorney represented that Greenwood would not make himself available to NFA for an interview "today or tomorrow". That e-mail did not suggest that Greenwood would be available at any later date. In addition, NFA received a voicemail from Walsh's attorney on the morning of February 12th in which the attorney represented that he "was not going to have [Walsh] interviewed at this point."

v.      Walsh and Greenwood's failure to cooperate with NFA's investigation has materially hindered NFA's efforts to determine the nature of their CPO business; their financial wherewithal and ability to repay WGTI which in turn would enable WGTI to repay its note holders, including the WCM Fund; the nature of WCM's activities, WGTI's activities, and WGTC's activities; the identities of their customers; the amount and location of funds deposited by those customers; and Walsh and Greenwood's treatment of their funds.

29.     Upon information and belief, including the foregoing findings by the NFA, the Defendants named herein have defrauded their investors by misrepresenting and/or omitting the material amount and nature of the assets under investment with the Westridge Group by failing to disclose that a significant amount of the assets of WGTI consisted of promissory notes issued by certain of the individual Defendants and entities controlled by those individuals.  For example, of the $400 million in "assets" held by the WCM Fund, $324 million were based on a note receivable from WGTI and there were on WGTI's financial books, "personal promissory notes" from Messrs. Greenwood and Walsh made payable to WGTI for hundreds of millions of dollars.

30.     Upon information and belief, including the foregoing findings by the NFA, the Defendants named herein have converted investor funds for their own use.

Plaintiffs' Efforts To Locate Their Investment Proceeds

31.     Immediately after Plaintiffs became aware of the NFA Suspension Notice, they both demanded the return of all proceeds that they had invested with the Westridge Group.

32.     Furthermore, representatives of plaintiff Carnegie Mellon made repeated attempts to obtain confirmation regarding the location and security of assets purportedly held by WCM, WCM Fund, WGTI and WGTC, to little avail.

33.     Among other things, on or about Friday, February 13, 2009, Carnegie Mellon's Treasurer and Chief Investment Officer, Edward Grefenstette, along with Charles A. Kennedy, a Senior Investment Manager with Carnegie Mellon, made numerous telephonic requests to representatives of WCM and the WCM Fund for documentation evidencing the location and security of the entities' assets. However, no documents were produced. Messrs. Grefenstette and Kennedy repeated and restated these requests multiple times throughout the weekend, to no avail.

34.     However, during a conversation with WCM's James Carder, on February 15, 2009, Mr. Carder informed Messrs. Grefenstette and Kennedy that Carder was "devastated" by the apparent actions of Greenwood and Walsh and their refusal to cooperate with the NFA. Carder further indicated that he had not spoken with Greenwood or Walsh since the Audit began. Mr. Carder went on to say that his "career is over" and further expressed shock at the conduct of his "partners of more than 20 years."

35.     On Monday, February 16, 2009, Mr. Kennedy flew to New York and sought permission to enter the Jersey City, New Jersey, and Greenwich, Connecticut offices of WCM Fund, WGTI and WGTC in order to receive information about the status of and the security of the funds and was met at each such office by an attorney from the law firm of Cooley Godward. At the Jersey City office, Mr. Kennedy spoke with Scott Pashman, Esq., and at the Greenwich office, Mr. Kennedy spoke with Maxine Sleeper, Esq. In each instance, the attorneys declined to show Mr. Kennedy any documentation concerning the amounts, whereabouts or security of any of the entities' assets.

36.     At the WGTI and WGTC offices in Greenwich, Connecticut, Ms. Sleeper indicated to Mr. Kennedy that Cooley Godward was representing WGTC

and WGTI, but not Greenwood or Walsh. However, very troublingly, when Mr. Kennedy asked Ms. Sleeper "who is in charge?" at the WGTI and WGTC offices, she replied that the answer was "tricky" and would not make clear who in fact was in charge.

37.    Through the date of filing of this Complaint, Carnegie Mellon has received only one document from Defendants providing any indication or assurance as to the whereabouts or security of any of the invested assets, which document was a telefax on February 18, 2009 from WCM that included a statement from Morgan Stanley & Co. dated January 30, 2009 under the name of "Westridge Capital Management, Inc. ADV., Westridge Capital Management Enhancement Funds" that showed an account balance of approximately $41.6 million.

38.    In a further effort to gain comfort, and ensure the security of their assets, representatives of Carnegie Mellon and their counsel contacted representatives of the Commission on Tuesday, and spoke with them on a conference call on Wednesday, February 18, requesting that Commission move forward urgently with an investigation and determination regarding taking WCM, WCM Fund, WGTC and WGTI into receivership, to protect the interests of all parties, including plaintiffs. Representatives of Carnegie Mellon have also had discussions with the enforcement division of the Securities and Exchange Commission (the "SEC").

39.    Representatives of the University of Pittsburgh also have made repeated attempts to obtain confirmation regarding the location and security of assets purportedly held by WCM, WGTI and WGTC, to little avail.

40.    Among other things, on or about Friday, February 13, 2009, Paul Lawrence, Assistant Treasurer, of the University of Pittsburgh spoke with Jack Reynolds

and James Carder of WCM.  Mr. Carder tried to explain the various transactions referenced in the NFA complaint, but could not explain the $147 million note from Walsh and Greenwood.  Carder and Reynolds stated that they thought the "money was there," but had not talked to Walsh or Greenwood since notice of the NFA complaint and claimed to be shocked by it.

41.     Later that same day, Amy Marsh, Treasurer and Chief Investment Officer of the University of Pittsburgh, and Mr. Lawrence asked Mr. Carder why the NFA complaint showed only $1.3 billion in assets under management rather than the $2.8 billion that Paul Greenwood had represented to Mr. Lawrence at a meeting at the University of Pittsburgh on January 21, 2009 were under management.  Mr. Carder said it was not $2.8 billion, rather only $1.8 billion in assets under management.  Later, Mr. Lawrence in a subsequent conversation also asked Mr. Carder whether the University of Pittsburgh could get back the $21,250,000 that it had sent to Westridge [WGTC] one week ago, Mr. Carder said he would check but never called back on this issue.

42.     Also on February 13, 2009, Mr. Lawrence called the Westridge Group to speak with Mr. Greenwood.  The secretary who answered the telephone said that she was the only person there but would give Mr. Greenwood the message to call Mr. Lawrence.  Mr. Greenwood never returned the telephone call.

43.     Also on Friday, February 13, Ms. Marsh and Mr. Lawrence spoke with Mr. Raleigh at the NFA in an attempt to get more information and to seek return of its funds, including the $21,250,000 that the University of Pittsburgh had sent to Westridge [WGTC] just one week before.

44.     In connection with a conference call on February 18, 2009,

representatives of the University of Pittsburgh and their counsel spoke with individuals

from the enforcement division of the SEC regarding Westridge Group.  In connection

with such conversations, the University of Pittsburgh urged the SEC to move forward

urgently with an investigation.

45.     Based on the NFA's findings and Defendants' behavior described

above, Plaintiffs will suffer irreparable injury if the Court does not enter appropriate

injunctive relief against Defendants.

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF SECTION 4b OF THE COMMODITY EXCHANGE ACT**

46.     Plaintiffs repeat and reallege the allegations made by each of them

contained in paragraphs 1- 45 as though fully set forth herein.

47.     Section 4b(a)(2)(i)-(iii) of the Commodity Exchange Act, 7 U.S.C.

§§ 6b(a)(2)(i)-(iii), makes it unlawful for any person to cheat or defraud or attempt to

cheat or defraud; or willfully make or cause to be made to other persons false reports or

statements, or willfully enter or cause to be entered for other persons false records; or

willfully deceive or attempt to deceive by any means whatsoever other persons; or

willfully deceive or attempt to deceive by any means whatsoever other persons in

connection with orders to make, or the making of, contracts of sale of commodities, for

future delivery, made, or to be made, or the making of, contracts of sale of commodities,

for future delivery, made, or to be made, for or on behalf of such other persons where

such contracts for future delivery were or may have been used for (a) hedging any

transactions in interstate commerce in such commodity, or the produce or byproducts

thereof, or (b) determining the price basis of any transaction in interstate commerce in

such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

48.    Upon information and belief, as set forth in the NFA Suspension Notice and accompanying affidavit of Ms. Sunu of the NFA, each of the Defendants named herein cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants, including Plaintiffs (Carnegie Mellon as an investor in the WCM Fund and the University of Pittsburgh as an investor in the WGTC Pool through its investment in the Note (defined below), together, the "Plaintiff Participants") by misrepresenting the nature and amount of the assets held in the WGTC Pool, WGTI, and, with respect to Carnegie Mellon, the WCM Fund, and failing to disclose the material facts that a significant portion of the funds held in such entities were based on promissory notes from related persons or entities in violation of Sections 4b(a)(2)(i) and (iii) of the Act.

49.    Upon information and belief, each of the Defendants named herein cheated or defrauded or attempted to cheat or defraud the Plaintiff Participants by willfully making or causing to be made false reports to the Plaintiff Participants who invested money with the Westridge Group to trade commodity futures contracts in violation of Section 4b(a)(2)(ii) of the Commodity Exchange Act.

50.    Plaintiffs have met the requirements set forth in Section 22 to bring a private right of action under the Commodity Exchange Act.

51.    As a result of the foregoing violation of Section 4b of the Commodity Exchange Act, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

## SECOND CLAIM FOR RELIEF
## <u>VIOLATIONS OF SECTION 4o OF THE COMMODITY EXCHANGE ACT</u>

52.    Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 51 as though fully set forth herein.

53.    Upon information and belief, each of the Defendants indentified above as a CPO, acted as a CPO in that they engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, have solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

54.    Upon information and belief, each of the Defendants identified above as a CPO, while acting in their capacity as a CPO, have violated Section 4o(1)(A) and (B) of the Commodity Exchange Act, 7 U.S.C § 6o(1)(A) and (B), in that, for the reasons set forth in the NFA Suspension Notice, they directly or indirectly employed or are employing a device, scheme, or artifice to defraud the Plaintiff Participants, or have engaged or are engaging in transactions, practices or a course of business which operated a fraud or deceit upon the Plaintiff Participants by means of the acts and practices described in the above paragraphs.

55.    Plaintiffs have met the requirements set forth in Section 22 to bring a private right of action under the Commodity Exchange Act.

56.    As a result of the foregoing violation of Section 4o of the Commodity Exchange Act, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

### THIRD CLAIM FOR RELIEF
### <u>VIOLATIONS OF SECTION 9 OF THE COMMODITY EXCHANGE ACT</u>

57.    Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1-56 as though fully set forth herein.

58.    A person registered under the Commodity Exchange Act violates Section 9 thereof when he/she embezzles, steals, purloins, or, with criminal intent, converts to such person's use any money or securities or property having a value in excess of $100.

59.    Upon information and belief, based on the NFA Suspension Notice and accompanying affidavit of Ms. Sunu of the NFA, Defendants named herein have converted funds belonging to the Plaintiff Participants.

60.    Plaintiffs have met the requirements set forth in Section 22 to bring a private right of action under the Commodity Exchange Act.

61.    As a result of the foregoing violation of Section 9 of the Commodity Exchange Act, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

### FOURTH CLAIM FOR RELIEF
### <u>VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND RULE 10b-5 PROMULGATED THEREUNDER</u>

62.    Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 61 as though fully set forth herein.

63.    The University of Pittsburgh invested proceeds with the Westridge Group on numerous dates beginning in 2002 and running until February 6, 2009. Carnegie Mellon began investing proceeds with the Westridge Group in April, 2008.  The

investments made by Plaintiffs were securities within the meaning of the Securities and Exchange Act of 1934.

64.     Upon information and belief, each of the Defendants named herein, by use of the means or instrumentalities of interstate commerce or of the mails, disseminated and/or approved the materially false and misleading representations and/or omissions specified throughout this Complaint, including misrepresenting the nature and amount of the assets held in the WGTC Pool, WGTI, and, with respect to Carnegie Mellon, the WCM Fund, and failing to disclose the material fact that a significant portion of the assets held in such entities were based on promissory notes from related persons or entities, in connection with the purchase or sale of securities.

65.     Upon information and belief, each of the Defendants named herein have thus violated §10(b) of the Securites and Exchange Act of 1934 and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs, in connection with the purchase or sale of securities.

66.     As a result of the foregoing, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

### FIFTH CLAIM FOR RELIEF
### FRAUD

67.     Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 66 as though fully set forth herein.

68.    Upon information and belief, including the above-referenced findings by the NFA, the Defendants named herein have defrauded their investors by misrepresenting and/or omitting the material amount and nature of the assets under investment with the Westridge Group by failing to disclose that a significant amount of the assets of WGTI consisted of promissory notes issued by certain of the individual Defendants and entities controlled by those individuals.

69.    Upon information and belief, Defendants made the foregoing misrepresentations and/or omissions with knowledge of their falsity or in reckless disregard of their falsity and with the intent to deceive Plaintiffs.

70.    Plaintiffs' reasonably relied on the foregoing fraudulent misrepresentations and/or omissions and were injured thereby.

71.    As a result of the foregoing, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

## SIXTH CLAIM FOR RELIEF
## RECKLESSNESS, GROSS NEGLIGENCE AND NEGLIGENCE

72.    Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 71 as though fully set forth herein.

73.    At all relevant times, each of the Defendants herein owed Plaintiffs a duty to exercise reasonable care, skill and diligence in performing their respective services.

74.    The above actions by the Defendants, if not knowing and purposeful were reckless, grossly negligent or negligent and in derogation of the duties that they owed to Plaintiffs.

75.     As a direct and proximate and result of Defendants' wrongful conduct, the Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

## SEVENTH CLAIM FOR RELIEF
## CONVERSION

76.     Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 75 as though fully set forth herein.

77.     The above-described activities of the Defendants named herein constitute the common law tort of conversion by said Defendants against the Plaintiffs.

78.     As a result of the foregoing, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

## EIGHTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY

79.     Plaintiffs repeat and reallege the allegations made by each of them contained in paragraphs 1- 78 as though fully set forth herein.

80.     Based on their roles as CPOs and/or CTAs, each of the Defendants identified as such above had a fiduciary duty to Plaintiffs.

81.     Based on its role as a federally registered investment adviser to the University of Pittsburgh, WCM had a fiduciary duty to the University of Pittsburgh.

82.     Upon information and belief, including the above referenced findings by the NFA, the Defendants named herein have breached their fiduciary duties to Plaintiffs.

83.     As a result of the foregoing, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but believed to be in excess of $114 million.

## NINTH CLAIM FOR RELIEF
### (By University of Pittsburgh against WGTI)
### FAILURE TO REPAY PROMISSORY NOTE

84.     The University of Pittsburgh repeats and realleges its allegations contained in paragraphs 1- 83 as though fully set forth herein.

85.     As previously explained, the University of Pittsburgh entered the IMA with WCM.  A copy of the IMA is attached hereto as Exhibit C.  The terms of the IMA are incorporated herein by reference.

86.     As a material inducement to enter into the IMA, the Defendants (other than Reynolds and Duffy) provided the University of Pittsburgh with a side-letter agreement dated as of November 1, 2002 (the "2002 Side-Letter"), which contained material representations, agreements and acknowledgments.  A copy of the 2002 Side-Letter is attached hereto as Exhibit D.

87.     Under the terms of the IMA, eighty percent (80%) of the investment account was to be invested in a Senior Promissory Note (the "Note") issued by WGTI, with the interest payable thereunder indexed to the return on a limited partnership interest in WGTC.  A copy of the Note is attached hereto as Exhibit E.  The terms of the Note are incorporated herein by reference.  Based on January 31, 2009 information provided by WCM, the Note had a market value of $48,450,811.96, with a cost basis of $31,072,000.

88.     The balance of the investment account (twenty percent (20%)) was to be invested by WGM in futures and liquid securities.

89.    On January 22, 2009, the IMA was amended to expand the original investment guidelines to permit WCM to invest an additional $25 million in a Russell 2000 product offered by WCM. As a material inducement to expand the IMA, the Defendants (other than Reynolds and Duffy) provided the University of Pittsburgh with a side-letter agreement dated as of January 22, 2009 (the "2009 Side-Letter"), which contained material representations, agreements and acknowledgments.

90.    On February 2, 2009, the University of Pittsburgh transferred $5 million to a Bank of New York Mellon trust account. Upon information and belief, WCM has used the $5 million to purchase Russell 2000 futures and liquid securities for the University of Pittsburgh's account.

91.    On February 6, 2009, at the direction of WCM, $21,250,000 of University of Pittsburgh's funds were wired to an WGTC account. While the additional investment through WCM was to be evidenced with an update to the schedule associated with the Note, it is unclear as to whether this action has been undertaken to date.

92.    As a result of the NFA Suspension Notice, discussed above, one or more "Events of Default" have occurred under clauses (d) and (e) of the Note. Pursuant to the terms of the Note, upon the occurrence of an Event of Default, the University of Pittsburgh has the right to accelerate the payment of all principal and interest due under the Note.

93.    As a result of the NFA Suspension Notice, discussed above, the Defendants (other than Reynolds and Duffy) have breached their representations made to the University of Pittsburgh, including the representation in Paragraph 8 of the 2002

Side-Letter, as confirmed in the 2009 Side-Letter, that the only business of WGTC is index arbitrage.

94.     By letter dated February 16, 2009, the University of Pittsburgh notified WGTI that, as a result of the occurrence of one or more Events of Default, the entire unpaid principal balance of the Note and all accrued but unpaid interest thereon was immediately due and payable to the University of Pittsburgh as the holder of such Note. This amount has not been paid, although duly demanded.

95.     By separate letter dated February 16, 2009, the University of Pittsburgh demanded that WCM immediately return to it the $21,250,000 in funds that were sent to WGTC on or about February 6, 2009. These funds have not been returned, although duly demanded.

96.     The University of Pittsburgh is the sole, true and lawful owner of the Note.

97.     No part of the aggregate unpaid balance of the Note has been paid although demanded.

98.     By reason of the foregoing, there is now due and owing from WGTI to the University of Pittsburgh, under the Note, approximately $52.3 million in principal, plus interest.

        **WHEREFORE**, Plaintiffs respectfully request that:

        (a) The Court order such temporary and preliminary relief as necessary to prevent each of the Defendants named herein from further violating the Commodity Exchange Act and the Securities and Exchange Act of 1934 and/or further depleting their assets to the detriment of Plaintiffs herein. This relief should include but not be limited

to the following:

(i) An order of the Court directing that Plaintiffs and their counsel be provided immediate access to each and every office of the Westridge Group to inspect and copy any business or financial records of each defendant named herein, whether in hard copy or electronic form;

(ii) An order of the Court restraining each of the Defendants named herein from destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored dated, tape records or other property of the Defendants wherever located;

(iii) An order of the Court permitting Plaintiffs to conduct expedited discovery, including but not limited to, the depositions of each defendant named herein;

(iv) An order of the Court directing that each defendant named herein make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to pool participants and other persons in connection with commodity futures and options transactions or purported commodity futures and options transactions, including the names, mailing addresses, email addresses and telephone numbers of any such persons from whom they received such funds from January 1, 2002 to the date of such accounting, and all disbursements for any purpose whatsoever of funds received from pool participants (and any other investors), including salaries, commissions fees, loans and other disbursements of money and property of any kind, from January 1, 2002 to and including the date of such accounting;

(v) An order of the Court prohibiting each defendant named herein

from concealing, transferring, disposing, gifting, encumbering, selling or liquidating, any real or personal property in which any defendant named herein has an ownership interest, including, without limitation, any and all assets of the corporate Defendants; and

(vi) An order of the Court appointing a receiver to take such steps as are necessary to manage the business and operations of the corporate Defendants and prevent any further depletion of the assets of said corporate Defendants.


(b) On its First through Eighth Claims, the Court award damages in favor of Carnegie Mellon in an amount to be determined at trial, but believed to be in excess of $49 million.

(c) On its First through Ninth Claims, the Court award damages in favor of the University of Pittsburgh in an amount to be determined at trial, but believed to be in excess of $65 million.

(d) The Court award Plaintiffs pre- and post-judgment interest, their attorneys' fees, costs and disbursements, and punitive damages; and

(e) The Court award Plaintiffs such other and/or further relief as may be just and proper.

/s/ Jack B. Cobetto
Michael E. Lowenstein
PA. I.D. No. 34880
Jack B. Cobetto
PA. I.D. No. 53444
Natalie C. Moritz
PA I.D. No. 65174

REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Tel:  (412) 288-7282
Fax:  (412) 288-3063

Attorneys for Plaintiffs
Carnegie Mellon University
the University of Pittsburgh –
Of the Commonwealth System
of Higher Education

Dated:  February 20, 2009